SAMUEL L. DAY *et al.*

*v.*

THE FORT SCOTT INVESTMENT AND IMPROVEMENT CO.

*Filed at Springfield October 30, 1894.*

1. FRAUD—*statement of intention or purpose is not.* Representations of a mere intention or purpose with reference to the future, (as distinguished from representations of present or past facts,) though never carried out, do not amount to fraud.

2. SAME—*street railway in "boom" addition.* The fact that a land company, at the time of selling lots in a "boom" addition, owns and operates a street railway leading to such addition, does not, in itself, amount to a representation that the company will continue to maintain and operate such railway.

3. SAME—*rescission of contract for fraud must be prompt.* A party wishing to repudiate a contract for fraud must do so at once upon making the discovery, tendering back what he has received, and, failing to do this, he cannot afterwards rescind.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on writ of error to the Circuit Court of Ford county; the Hon. ALFRED SAMPLE, Judge, presiding.

This was a bill in equity, brought by the Fort Scott Investment and Improvement Company, against Samuel L. Day, George Wright, Solomon Mercer and James Mer-

cer, to enforce the specific performance of a contract, as follows:

"This agreement, made this 28th day of April, A. D. 1887, between the Fort Scott Investment and Improvement Company of Fort Scott, Kansas, party of the first part, and Samuel L. Day, George Wright, Solomon Mercer and James Mercer, of Paxton, Ill., party of the second part:

"*Witnesseth*, that said first party, in consideration of the sum of sixty-three hundred ($6300) dollars, to be paid, as hereinafter mentioned, by said second party, has bargained and sold, and agrees to grant and convey to said second party, his heirs or assigns, in fee simple, clear of all encumbrances, by a good and sufficient warranty deed, all that real estate situate in Bourbon county, State of Kansas, and described as follows, to-wit: Lot 1, 3, 5, 7, block 77; lot 9, 11, block 30; lot 1, 2, block 42; lot 1, 2, 5, block 43; lot 1, 2, 3, 4, 5, block 46; lot 2, 3, 4, 5, block 48; lot 1, 3, 9, 11, block 67; lot 1, 3, 15, 17, block 68; lot 1, 3, 11, 12, block 85; lot 1, 2, block 86; lot 1, block 5; lot 11, block 50, in south side park addition to Fort Scott, Kansas; in consideration whereof said second party agrees to purchase said real estate, and to pay therefor to said first party the said sum of sixty-three hundred ($6300) dollars, as follows: Twenty-one hundred ($2100) dollars cash in hand, the receipt of which is hereby acknowledged, and a further sum of forty-two hundred ($4200) dollars as follows: Twenty-one hundred ($2100) dollars in one year from date and twenty-one hundred ($2100) dollars due in two years from date, both to bear interest from date, and interest from date at the rate of eight per cent per annum; also to pay seasonably all taxes and assessments hereafter levied upon or against said land; and in case of the failure of said second party to make any of said payments, this contract, and all rights of said second party thereunder, shall, at the option of said first party, be at..........party ...:.......in full satisfaction as agreed and ·liquidated

damages for breach hereof.   Deed to be given when parties of the second part wish it, on any one or more lots, and party of the first part agrees to give abstract of the above lots to date.

"In witness whereof, said parties have hereunto set their hands on the day and year above written, at Fort Scott, Kansas."

It was, among other things, alleged in the bill that defendants paid $2100 at the time of signing the agreement, but failed to pay $2100 and interest due in one year; that July 16, 1888, defendants sold to Thomas Swan lot 1, block 46, lots 2, 5, block 48, and lot 12, block 85; that complainant, July 16, 1888, conveyed to Swan the lots so sold, and that Swan paid to complainant $540 therefor, being balance of purchase price due therefor; that when the last payment was due, complainant tendered defendants a warranty deed duly executed, and abstract of title, to all lots except those conveyed to Swan, and demanded payment of the amount due on the contract.

The defendants put in an answer to the bill, in which they set up as a defense that they were induced to enter into the agreement by the false and fraudulent promise of the complainant that it would extend a certain street railway which it was then operating in said city, to and through said addition in which said lots were located; that rails and ties had been placed on the ground along the line of the proposed extension; and by the further promise that complainant would continue to bore for natural gas, boring having been begun, and that in a short time it would have said natural gas, and would have said extended street railway in operation; that soon after defendants were so induced to enter into said contract the complainant took away said ties and rails so distributed, and took up the railway already built, and abandoned the boring for gas; that by reason of the failure of said complainant to do as it had so promised, the lots became worthless, and that if the said representations

had been fulfilled the defendants could have realized a profit on said purchase. The defendants also filed a cross-bill setting up the facts contained in the answer, and prayed that the contract be declared void, and that the amount paid be refunded.

The complainant, in answer to the cross-bill, denied that the defendants were induced, by false promises and representations, to make said contract; alleged that they bought on their own judgment; that the street railway was and is a permanent structure, and that the said ties and rails so distributed for the proposed extension were not placed there for the alleged fraudulent purpose; that the boring for natural gas was continued until it was proved that gas in paying quantity could not be found; denied all false representations alleged, etc.

An amended cross-bill was filed, in which it was, among other things, alleged that the complainant had also fraudulently and falsely represented that it owned a spring of pure, fresh water in or adjacent to said addition, which it would clean out and deepen, and that it would beautify the grounds thereabout by planting trees, etc., and that this representation, which was never fulfilled, had a material influence upon the defendants in leading them to enter into said agreement of purchase. An answer was filed to the amended cross-bill, and the cause referred to the master to take the evidence. The evidence of the respective parties was taken by the master and reported to the court, and on the hearing the court entered a decree in favor of complainant, as prayed for in the bill. The defendants appealed to the Appellate Court, where the decree was affirmed.

Messrs. COOK & MOFFETT, for the plaintiffs in error:

An application for specific performance of a contract is addressed to the sound legal discretion of the court, and even where a legal contract is shown to exist, it will not be decreed as a matter of course. *Bowman* v. *Cunning-*

*ham,* 78 Ill. 48 ; *Frisby* v. *Ballance,* 4 Scam. 287; *DeWolf* v. *Pratt,* 42 Ill. 198.

Specific performance is not a matter of right, but a matter of sound discretion in the court.    *Woods* v. *Evans,* 113 Ill. 186 ; *Shaw* v. *Schoonover,* 130 id. 448 ; *Wallace* v. *Rappleye,* 103 id. 229 ; *Railroad Co.* v. *Reno,* 113 id. 39.

Specific relief will be granted only when it is apparent that it will subserve the ends of justice.    *Willard* v. *Taylor,* 8 Wall. 557.

Where there is anything that makes it unconscionable, specific performance will not be decreed.    *Iglehart* v. *Vail,* 73 Ill. 63.

It is only on the principle that it is unjust and inequitable to permit the contract to remain unexecuted, that a court of chancery assumes the power to enforce it. *Tamm* v. *Lavalle,* 92 Ill. 263.

Complainant must have clean hands, and a cause that appeals to equity for relief.    *Kelly* v. *Kendall,* 118 Ill. 650.

Specific performance will not be decreed unless the agreement has been entered into with perfect fairness, and without misapprehension, misrepresentation or oppression.    *Frisby* v. *Ballance,* 4 Scam. 287.

Misrepresentations, or any unfairness, will induce the court to refuse its aid.    *Cathcart* v. *Robinson,* 5 Pet. 264.

There is a difference between enforcing an executory contract, and setting aside a contract executed.    *Seymour* v. *Delaney,* 3 Cow. 445.

It is not necessary, to authorize the court to refuse a specific performance, that the agreement should be so tainted with fraud as to authorize a decree that it should be given up and canceled on that account.    *Frisby* v. *Ballance,* 4 Scam. 287; *Race* v. *Weston,* 86 Ill. 92.

Mr. J. H. MOFFETT, and Mr. J. D. McCLEVERTY, for the defendant in error :

A statement or representation as to something to be done and performed in the future cannot be made a ground

for a defensive or offensive right at equity or law.   *Rail-road Co.* v. *Mathers,* 77 Ala. 357; *Lake* v. *Loan Ass.* 72 id. 207; *Railway Co.* v. *Tetterington,* 84 Tex. 218 ; *Tuck* v. *Downing,* 76 Ill. 71; *Gage* v. *Lewis,* 68 id. 604; *Dillman* v. *Nadelhoffer,* 119 id. 567; *Young* v. *Young,* 113 id. 430 ; *Bristol* v. *Braid-wood,* 28 Mich. 191; *Lawrence* v. *Gayetty,* 78 Cal. 126 ; *Knowl-ton* v. *Keenan,* 146 Mass. 86.

Parol evidence is only admissible to vary, modify, enlarge or annul a contract when fraud or mistake is alleged and proved. *Emery* v. *Mohler,* 69 Ill. 221; *Knowlton* v. *Keenan, supra.*

There is no claim of mistake made by plaintiffs in error as to the terms of the contract.   The terms of the contract are as agreed upon.  Fraudulent representation, with intent to deceive, is the defense of the plaintiffs in error.   The contract must stand, unless they can succeed on the defense of fraudulent misrepresentation, and thus avoid or annul it.  (*Emery* v. *Mohler, supra.*)  The fact that property depreciates in value rapidly, and should only be worth one-third or one-fourth the cost or original price, does not render the contract unconscionable, in the meaning of that term, when considered by courts of equity. *Franklin Tel. Co.* v. *Harrison,* 145 U. S. 900 ; *Cathcart* v. *Robinson,* 5 Pet. 264; *Marble Co.* v. *Ripley,* 10 Wall. 339.

When a party discovers that fraud has been practiced upon him, it is his duty to at once, without any delay, repudiate the contract which was induced by such fraud, and tender back what he received, so as to as nearly as possible place the party *in statu quo.   Grimes* v. *Saunders,* 93 U. S. 55 ; *Greenwood* v. *Fenn,* 136 Ill. 146; Pomeroy's Eq. Jur. secs. 897, 964, 965; *Linington* v. *Strong,* 107 Ill. 295 ; *Strong* v. *Lord,* id. 25 ; *Dowden* v. *Wilson,* 108 id. 257 ; *Kelsey* v. *Snyder,* 118 id. 544; *Brown* v. *Brown,* 142 id. 409.

Mr. JUSTICE CRAIG delivered the opinion of the court :

In the spring of 1887 there was what is termed a "boom" in real estate at Fort Scott, Kansas.   Several wells had

been sunk which produced natural gas, and the gas was in use, to some extent, for heating purposes, and it seemed to be the prevailing opinion that gas would be obtained in quantity sufficient to supply all demands for manufacturing purposes. Lands were being laid off in town lots, purchasers were coming in, and everything seemed to indicate that the town was on the eve of a rapid growth. Such was the condition of things when the defendants visited Fort Scott with the view of investing for speculation. After their arrival they called on several real estate agents, and finally met William Brown, who represented the Fort Scott Investment and Improvement Company. He called their attention to the addition in question as a good place to invest. He took them over the property, showed them the street railway, partly built, and ties and iron distributed along the proposed line. They were also shown a well on the land, sunk for gas, and a spring of water.

It is claimed that false and fraudulent representations were made by the agent of the complainant, before the contract of purchase was executed, in regard to the intention of the complainant in boring for natural gas, in improving the grounds about the spring, and in reference to the construction and operation of the street railway. As respects the representations the defendant Day testified: "Prior to the time these agreements were signed, Brown took a carriage and drove us out over the addition; showed us the property; showed us the street car line where it had been running and where they intended to extend a line, and we selected lots with reference to this line of road and other improvements that were expected to be made. * * * Brown said that complainant was going to build this proposed railway." As to the natural gas he testified: "Brown showed us where they had commenced to bore for a gas well. It was abandoned for some reason, but he said they were going to commence and sink it deeper,—and they felt sure they could

strike gas at that point." The defendant Wright, after testifying in regard to the street railway and gas well substantially as the other defendant did, also testified that Brown showed them the spring on the addition, and said they had reserved some lots there, and were going to improve the spring and make a little park there.

The Appellate Court, in considering what bearing these representations had on the contract executed by the parties, speaking through Justice WALL, said :

"It will be noticed that the representations charged to have been false and fraudulent referred to no existing facts, but merely amounted to promises as to something to be done in the future. As was said in *Gage* v. *Lewis*, 68 Ill. 604: 'Even if, at the time they were made, it was not intended to comply with them, it was but an unexecuted intention, which has never been held, of itself, to constitute fraud.' 'As distinguished from the false representation of a fact, the false representation of a matter of intention not amounting to a matter of fact, though it may have influenced a transaction, is not a fraud in law.' (Kerr on Fraud and Mistake, 88.) So it is said in Bigelow on Estoppel, 481: 'The representations or concealment must also, in all ordinary cases, have reference to a present or past state of things, for if a party make a representation concerning something in the future, it must generally be a statement of intention or opinion undertaken to the knowledge of both parties, or it will come to a contract, with the peculiar consequences of a contract.' In Pomeroy's Eq. Jur. sec. 877, it is said : 'A statement of intention, merely, cannot be a misrepresentation amounting to fraud, since such a statement is not the affirmation of an external fact, but is, at most, only an assertion that a present mental condition or opinion exists.' Such is no doubt the general rule.

"As to the development of natural gas, and the improvement of the spring and the property adjacent, it seems quite clear there is no sufficient ground for denying

the relief sought by the bill. It appears from the evidence that the boring for natural gas was prosecuted by other parties until it was demonstrated that there was no such quantity to be had as to be of practical value. Natural gas had been found in shallow wells and in small quantities, and it was thought that deeper wells would develop an abundant supply; but it turned out otherwise, and thus, no doubt, had much to do with breaking the 'boom' in this and adjacent property. The failure by the complainant to further prosecute its boring should not be deemed important, in view of the result established by other borings. The deepening of the spring and making attractive surroundings was very clearly a matter which would rest wholly in the future, and about which there could be merely an intention, dependent upon the contingency that circumstances would justify such action. It can hardly be supposed that a practical man would attach any importance to a matter manifestly so contingent and indefinite.

"There is more difficulty as to the alleged representations with regard to the street railway. It appears that the complainant was the owner of said street railway, and that at the time this contract was made the line was in operation a considerable distance toward this addition, and ties and rails had been distributed upon a part of the line of a proposed extension which would pass through the addition, and it was proved that Brown, the agent of the complainant, showed the defendants where the extension would run, and assured them that it would be built as proposed. It is shown, also, that the lots, or some of them, were selected with reference to the proposed line, and it may be assumed that the belief of the defendants that the line would be so extended had much to do, not only with their selection of lots, but also with their determination to invest in the addition. It is, however, not probable that they would have so invested but for their faith in the future of the city. If that faith was

well founded, the growth of the city in that direction would certainly justify the extension of the railway as projected and proposed. So they probably reasoned, and hence they believed the railway would be extended because they believed the city would grow in that direction, independently of any assurances they received from the complainant's agent. But the failure of natural gas and other causes had a depressing effect. The prospect changed. According to the testimony, the 'boom' in this addition, and perhaps in the city, began to subside soon after the contract was made. The ties and rails that had been so distributed along the proposed extension were removed during the summer. The line was not extended, and a part of that already laid was taken up and diverted so as to reach the fair ground, lying in a somewhat different direction. Only a part of the line as now laid is operated daily, the residue, extending to the fair ground, only when the fair or other attractions make it desirable. All this followed as the natural result of the general depression in the locality. Had the expected growth been realized, the street railway would have been required, and very probably it would have been extended as was planned. But upon a moment's reflection it would have occurred to the defendants, who were men of some experience and in the habit of acting upon their own judgment, that the railway would be extended in the contingency that it was needed, and not otherwise, and they must have understood it was in view of this contingency, then on all hands believed to be almost a certainty, that the alleged representations or promises were made. Thus it is seen that such representations were not of a fact then existing, but purely of an intention or purpose with reference to the future, which might be wholly changed by subsequent developments."

After a careful consideration of the subject we think the Appellate Court took a correct view of the law applicable to the case, and we concur in what was said.

But it is insisted in the argument that the street rail-way, so far as it was then constructed, was an existing fact, and the ties and iron placed along the route of the proposed extension were existing facts.    The legal effect of the representations was, that the road was there to stay, and that the ties and rails on the ground were there to be placed in the track, and hence the rule in regard to a promise of something to be done in the future does not apply.    It appears from the evidence contained in the record that the street railway was operated as located when the lots were purchased, until August or Septem-ber, 1888, when the complainant took up the street rail-way track all south of a point about four blocks north of Eighteenth street, and relaid it, extending down Main street and Fair Ground avenue to the south line of south side park addition to Fort Scott, Kansas, that being the southern limit to which it had been built at the time the defendants were there, in April, 1887, and such line is oper-ated regularly every day down to a point on Main street a block and a half north of Eighteenth street, and beyond that point it is operated when a fair or races are held in the fair ground, which joins south side park addition on the south.    U. B. Pearsol testified in regard to the change of the line of the street railway, as follows : "When Main street, which connects with Fair Ground avenue, as shown by plat, was graded and opened, so as to render a shorter route, the route was changed to Main street and down Fair Ground avenue to the fair ground, and is at present located and operated there.    Myself and other directors and stockholders purchased a large number of lots con-tiguous to the line as shown on plat.    The changing to Main street and Fair Ground avenue, if there is any benefit by the location of the railroad, results greatly in favor of the enhancing of the value of these lots, as the plat will show that a large majority, in fact all but two, are more accessible to the line as now located than it was origi-nally."    From this testimony it seems apparent that the

change made in the line of the street railway has resulted in no serious damage to the defendants. Moreover, there was nothing in the representations made which would require the complainant to maintain and operate a street railway, for all time to come, on a particular line where it was not demanded by the public and when it would not pay operating expenses, to say nothing about a profit on the investment.

But if the misrepresentations relied upon were as to existing facts and were fraudulent, are the defendants in a position to ask a court of equity to rescind the contract? It is a familiar rule, and one well settled by the authorities, that where a party discovers that fraud has been practiced upon him in the making of a contract, it is his duty at once to repudiate the contract and tender back what he has received under the contract, so that the other party may be placed as nearly as possible in the same position he occupied before the contract was made. *Grymes* v. *Sanders*, 93 U. S. 55; *Greenwood* v. *Fenn*, 136 Ill. 146; Pomeroy's Eq. Jur. secs. 897, 964, 965; *Linington* v. *Strong*, 107 Ill. 295; *Strong* v. *Lord*, 107 id. 25; *Dowden* v. *Wilson*, 108 id. 257; *Kelsey* v. *Snyder*, 118 id. 544; *Brown* v. *Brown*, 142 id. 409.

In *Greenwood* v. *Fenn, supra*, where a bill was interposed to set aside a contract for the sale of land on the ground of fraudulent representations as to the quality of the land, in the decision of the case it is said: "The rule on this subject is well stated in *Grymes* v. *Sanders*, 93 U. S. 55, as follows: 'Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation

are fatal to the right which had before subsisted.' The rule is also laid down in 2 Pomeroy's Eq. Jur. sec. 897, as follows: 'All these considerations as to the nature of misrepresentations require great punctuality and prompt-ness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable dili-gence to disaffirm the contract or abandon the transac-tion, and give the other party an opportunity of rescinding it, and of restoring both of them to their original posi-tion. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be re-lieved from his own obligations by a rescission, or a re-fusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations.' "

It seems from the evidence that upon the making of the purchase one of the defendants, Day, opened an office at Fort Scott for the purpose of selling the lots, and re-mained there until the last part of December, 1887, when he returned to this State. Thus he, and the other de-fendants through him, knew that the complainant was not making the improvements which it claimed were to be made, and, as appears from the evidence, the de-fendants, as early as April 28, 1888, determined among themselves that they would make no further payments on the contract. But no notice of this determination was given to the complainant. They divided thirty-two of the lots among themselves. Four of the lots were sold to a man named Swan, and on July 4, 1888, the defend-ants signed an order, in writing, requesting the complain-ant to convey those lots to him, which was done. On the next day the following letter was written to the com-plainant:

153—20

"PAXTON, ILL., *July 5, 1888.*

*"Fort Scott Investment Co.:*

"We have just given Mr. Swan an order on you for a deed to four lots described in order. He says he has arrangements with you to send deed to bank here, where he has money to pay in full for the lots. You must not be too hard on us for bal. due. We need all the leniency you can possibly give, and give us a chance to dispose of the others in some way. We have several trades on hand, and hope to dispose of some of them. Give us a chance to get out of the hole. We have paid you a good deal of money, and spent a good deal of time, money and gas on Fort Scott. Don't care anything about the time and gas, but would like the money back, and think if it was convenient to hold the lots a few years there is money in them. I have more confidence in Fort Scott than in any city in Kansas, and hear more of Fort Scott and Hutchinson than all the bal. in the State.

S. L. DAY."

Indeed, we find nothing in the record manifesting an intention on behalf of the defendants to rescind the contract before the filing of the bill for a specific performance. On the other hand, all that was said and done by the defendants was but an affirmance of the contract. Under such circumstances they are precluded from claiming a rescission of the contract on the alleged ground of false representations.

Some minor questions have been raised in the argument, which we have considered, but we find no merit in them.

After a careful consideration of the entire record we think the judgment of the Appellate Court is correct, and it will be affirmed.

*Judgment affirmed.*