[L. A. No. 13092. In Bank.—July 29, 1933.]

C. WOOSTER GIST et al., Respondents, v. SECURITY TRUST & SAVINGS BANK (a Corporation) et al., Appellants.

Chapman & Chapman for Appellants.

Guy Richards Crump and Philbrick McCoy for Respondents.

PRESTON, J.—Action for rescission of a contract for the purchase of real property. Judgment for plaintiffs. Appeal by defendants.

About December, 1925, the Los Feliz Hills Tract in Los Angeles was opened for subdivision and sale to the public. Defendant bank, as trustee, held title to the property to secure an indebtedness to it, under the terms of a trust agreement whereby one Dickson was named as trustor and defendants Edwards & Wildey Company, Cooper, Williams, Laack and Cotton were named as beneficiaries. Edwards & Wildey and Laack and Williams were selling agents for the tract and the latter firm employed a licensed real estate salesman, Louis G. Wurtz, through whom the transaction with plaintiffs was consummated.

Plaintiff, Mrs. Gist, had known Mr. Wurtz for many years. For many years also she had coveted, for a home site, one

particular knoll, or portion of land in the tract, from which could be had a wide valley view of surrounding territory, which she considered superior to that obtainable from any other point. Shortly after the opening of the tract, she noticed that the land was to be subdivided. She immediately sought Mr. Wurtz, told him of her desire for said certain parcel of land and later she inspected the territory with him and pointed out the exact spot upon which she wished to build a home. He assured her that the lot was for sale, whereupon she consulted her husband, plaintiff C. Wooster Gist, and the following day again visited the place with him and with Mr. Wurtz. The lot was situated on a steep hillside, fan-shaped and narrowing toward the rear. The front stakes were not visible. There was some conversation as to the location of the side boundaries. The salesman picked up a stone, threw it roughly down the hill toward a tree and told plaintiffs that the course of the stone marked the approximate borderline of the lot; that the tree itself would not be on their property but that the spread of it would extend over the boundary.

A day or two later plaintiffs, a brother-in-law, an architect and the salesman again inspected the lot, their main object being to determine the cost and feasibility of building on the steep slope. At this time the rear boundary was marked by corner stakes but the widening of the lot to the front was only estimated as on the previous day. Plaintiffs felt satisfied with their inspection of the property and soon thereafter, and on March 1, 1926, they made a down payment of $1187.50 on the $4,750 purchase price thereof, agreeing to pay the balance in three equal yearly installments, with quarterly interest on deferred payments. A document entitled ''purchaser's receipt'', setting forth the terms of the sale, was executed by Mr. Wurtz and indorsed ''accepted'' by Mr. Murray Brophy on behalf of Edwards & Wildey Company. On the same day, March 1, 1926, the formal contract of purchase and sale was executed by plaintiffs and by defendant bank.

Plaintiffs kept up their interest payments and also made the payments of $1187.50 due on the principal in March, 1927, and March, 1928, but they did not visit the property again until April, 1928, when for the first time they noticed that the laying out of streets and subdivision work had been

completed and front stakes marked the property line of their lot. They were surprised at this time to discover that the land they had intended to purchase, and thought they were purchasing, described as "lot 26" in the contract, was in fact a part of lot 26 and a part of lot 27; that lot 26 would not afford them the full view they desired and that its side boundary line, instead of being some four or five feet west of the above-mentioned tree as estimated, was in fact approximately twenty-five feet from it.

Plaintiffs immediately informed Mr. Wurtz, who was still employed by Edwards & Wildey Company, though not on the tract, that there must be some mistake; he promised to consult his superiors and, after a number of conversations, a conference was had with Mr. Brophy, who had accepted the contract for Edwards & Wildey. Plaintiffs asked for a delivery of the property they thought they were purchasing, or for a return of the money paid by them. They were told from time to time that the matter was being taken up with the various beneficiaries. The illness of Mr. Gist caused further delay in the negotiations but Mr. Wurtz later reported that his efforts toward adjustment had been unsuccessful. The matter was then brought before the real estate commission (in November, 1928) and Mr. Brophy, on behalf of defendants, asked for further time to consider an adjustment. Other proceedings were had over a period of weeks and it was not until about January 18, 1929, that plaintiffs were finally and authoritatively advised that a settlement could not be effected. Their notice of rescission was served the next day and this action was commenced on March first thereafter.

The court made findings upholding the facts as reflected in the above statement; that is, the court found that said contract was entered into by plaintiffs under the mistaken belief that the lot therein described was the property they had inspected and intended to purchase; otherwise they would not have made the purchase; that when the mistake was discovered by them, about April 1, 1928, they promptly notified defendants; made no further payments of principal or interest, and refrained from taking direct action toward rescission only until they finally learned from defendants that the controversy could not be settled amicably.

■ The findings and conclusions of the court below and the judgment have abundant support in the evidence. Indeed, the several contentions of appellants do not merit extended consideration. Their claim that plaintiffs are precluded from recovery because of delay and lack of diligence, the record shows to be without foundation. Immediately upon discovery of the mistake, plaintiffs sought an adjustment from defendants; there was no cessation of their efforts in this direction and the evidence clearly shows that the lapse of time before formal rescission was made, was due to the attitude of defendants themselves in indicating that a settlement without litigation could probably be effected and in asking for extensions of time in which to consider the matter. ■ Section 1691 of the Civil Code provides that a party must rescind promptly upon discovery of the facts which entitle him to rescission, but no definite period is provided and the question of laches is one for the trial court. Where, as here, a party protests promptly upon discovery of the facts entitling him to rescind and then immediately enters into negotiations for peaceable adjustment, a rescission made within a reasonable time after failure of compromise or settlement, is not barred by laches. (*Sherratt* v. *Hellman etc. Bank,* 112 Cal. App. 542 [297 Pac. 582], and cases cited; *Hunt* v. *L. M. Field, Inc.,* 202 Cal. 701 [262 Pac. 730].) In this cause the evidence fully supports the findings of the court below on the issue of laches.

■ The payment by plaintiffs on July 28, 1928, of a storm drain assessment of $47.84 against the property, did not constitute an affirmance of the contract or waiver of the right of rescission, in view of the findings of the trial court, well supported by the evidence, to the effect that said payment was made solely for the purpose of protecting and preserving the property so plaintiffs might be in a position to reconvey it to the vendors should restoration ultimately be required.

■ Appellants contend that as plaintiffs made no payments of principal or interest after discovery of the mistake, and as time was of the essence of the contract, plaintiffs were in default at the time of rescission and cannot prevail. Had plaintiffs made any payment, appellants would doubtless rely upon the very claim they assert with respect to

the storm drain assessment payment, to wit: that such act, being an act of dominion over the property, would constitute an affirmance of the contract or waiver of the right of rescission. However, as above set forth, the evidence shows that plaintiffs were lulled into a sense of security by the acts of defendants; hence defendants are estopped to assert the delay or alleged default of plaintiffs. For the same reason defendants are estopped to complain that they will suffer loss because of a decline in real estate values over the period in question.

■ The evidence showing that the mistake here involved was such as to justify a rescission is clear and convincing and the authority of Mr. Wurtz to negotiate the sale and his connection with the other defendants is well established. There was no error on the part of the court below in admitting evidence of conversations had with Mr. Wurtz during the course of the entire transaction.

■ The contract of purchase contained a provision to the effect that the buyer had inspected the property and purchased it ''wholly as a result of said inspection and not upon any representation by the seller, or its agent'' and that the, buyer therefore waived all claim for damages by reason of any representation other than the covenants of the written contract. Appellants claim that this provision should estop plaintiffs from recovery herein. But plaintiffs have claimed no more at any time than the property they actually inspected. They are not seeking to enforce any representation outside the written contract. They claim that, through mistake, the contract failed to describe the property they inspected and purported to buy. The mistake dates from the inception of the transaction and plaintiffs could not have ascertained the lot number from their inspection of the land.

■ It is contended that the court erred in rendering a joint and several judgment against all of the defendants for return of the sums paid by plaintiffs, upon reconveyance by them of the property to defendant bank. Defendant bank was trustee and held the legal title to the property. The other defendants, by their pleadings, admitted a beneficial interest in the trust; in addition, some of them were also selling agents for the tract. Defendant beneficiaries are asserted to have participated proportionately in the distribution of payments made by plaintiffs. Appellants argue

that as the trustee disbursed the payments before any question was raised as to the validity of the contract, it should not be held liable for return of said money and that the respective beneficiaries should be held liable only for the proportionate amount of the distribution made to each of them. The evidence shows, however, that the bank executed the contract as the result of the negotiations conducted through defendant selling agents on behalf of all the defendants. It should, therefore, be held liable in its representative capacity, as trustee, only. Defendants, having shared jointly and severally in the fruits of the transaction, are in no position to deny their liability in the matter of rescission. The evidence supports the findings of the court as to the relationship of the parties defendant and warrants the entry of a joint and several judgment against them.

Paragraph 3 of the judgment is hereby amended to read as follows: "That plaintiffs have and recover of and from defendants and each of them, the sum of $4071.45 principal; the further sum of $1131.37 interest to March 1, 1931; making in all the sum of $5202.82, together with interest on said total sum of $5202.82 from March 1, 1931, at the rate of seven per cent (7%) per annum until paid. The liability of defendant Security Trust & Savings Bank, a corporation, is limited, however, to a judgment against it in its representative capacity as trustee." As so modified, the judgment is affirmed.

Thompson, J., Waste, C. J., Langdon, J., Seawell, J., and Curtis, J., concurred.

Rehearing denied.